[File No. 6771]

THE FIDELITY & CASUALTY COMPANY OF N. Y., a Corporation, Appellant, v. FIRST NATIONAL BANK & TRUST COMPANY OF FARGO, a Corporation, Respondent, and McVILLE STATE BANK OF McVILLE, NORTH DAKOTA, a Corporation, Respondent.

(1 NW(2d) 401)

416

, Opinion filed December 23, 1941

*Philip B. Vogel,* for appellant.

*Conmy & Conmy* and *Francis Murphy,* for respondents.

MORRIS, J. The complaint in this case sets out ten causes of action each of which is on a check issued by the Investment Corporation of Fargo payable to the Gulbro Implement & Hardware Company. Six of the checks were drawn upon the Merchants National Bank & Trust Company. Four of them were drawn upon the Dakota National Bank. Both are banking institutions located in the city of Fargo. These checks were issued at various times from September 15, 1938 to July 20, 1939. All were cashed by the McVille State Bank within a few days after issuance. The McVille State Bank indorsed each check in the usual course of banking practice and forwarded it to the First National Bank, its correspondent in Fargo. The First National Bank indorsed each check and transmitted it for payment through the Fargo Clearing House to the bank upon which it was drawn, being the Dakota National Bank or Merchants National Bank & Trust Company as the case might be. The drawee banks paid the First National for each check which thereupon credited the McVille State Bank with the payment thus received.

The Gulbro Implement & Hardware Company was a trade name of A. L. Gulbro. On August 17, 1939, the Investment Corporation, having received a letter from A. L. Gulbro stating that the transactions which resulted in the issuance of the checks were fraudulent and fictitious, made demand upon the drawee banks for a restoration of credit and returned the checks to the banks upon which they were drawn. The drawee banks denied liability but made demand upon the First National Bank as indorser.

The plaintiff, the Fidelity & Casualty Company of New York, had insured the Investment Corporation against certain losses and because of its contract of insurance paid the amounts of these checks less certain salvage. The amount paid to the Merchants National Bank & Trust Company was $1,108.43. The payment to the Dakota National Bank was $937.54. The accounts of the Investment Corporation were credited

with these respective amounts. Assignments were taken by the plaintiff from these banks and from the Investment Corporation. In its complaint, the plaintiff asks judgment against the First National Bank & Trust Company of Fargo for the total amount that was paid to the drawee banks. The McVille State Bank having cashed the checks in the first instance and being a prior indorser intervened in the action. Both the defendant and the intervener entered general denials and affirmatively set out that the loss was caused or contributed to by the negligence of the Investment Corporation, assignor of the plaintiff. This suit in substance narrows down to an action against the McVille State Bank, the bank that cashed and indorsed the checks.

The case was tried to the court without a jury and resulted in a judgment for dismissal of the action. Further facts pertinent to the decision of this controversy are these. During the time involved in this case, A. L. Gulbro was a sole trader who operated chiefly as The Gulbro Implement & Hardware Company although at times he also used the name Gulbro Motor Company. He dealt in hardware, farm implements and automobiles. This business was located in the town of Pekin. This town consisted of about three hundred people and had no bank. For a time, A. L. Gulbro also operated an unincorporated concern known as the Pekin Exchange at which checks could be cashed for the convenience of local residents. The Investment Corporation was a financing company operating through the medium of conditional sales contracts. It started handling contracts for Gulbro in 1937 and continued to do so until the present difficulty came to light. A. L. Gulbro maintained a checking account with the Farmers & Merchants State Bank located at Tolna, North Dakota, about seven miles west of Pekin. He maintained no checking account with the bank at McVille located about nine miles east of Pekin.

A. L. Gulbro employed his son, Elroy, in connection with the operation of his business enterprises in Pekin. On August 30, 1938, the son, Elroy Gulbro, filled out a blank conditional sales contract with wholly fictitious entries describing an oil heater, an oil range and a washing machine as having been purchased from the Gulbro Implement & Hardware Company by one Perry Knauss. He forged the name of the purchaser and the names of witnesses to the contract. He also forged

the name of his father to an assignment of this contract to the Investment Corporation. He mailed the contract to the Investment Corporation which issued a check to the Gulbro Implement & Hardware Company on September 15, 1938, and mailed it to that company at Pekin. Elroy Gulbro had access to his father's mail box at the post office. He intercepted the letter, extracted the check and presented it for payment at the McVille State Bank where he indorsed the check.

"Gulbro Impl. & Hdwe Company
A. L. Gulbro, Owner
By: E. O. Gulbro"

He received $270, the amount of the check in cash. The other nine checks involved in this lawsuit were issued by the Investment Corporation upon other fictitious contracts of a similar nature prepared and sent in by Elroy Gulbro. In each instance, he intercepted the checks and cashed them himself or caused them to be cashed for him by innocent parties. He obtained cash on all checks except one. For the proceeds of one check he received a draft.

A. L. Gulbro did not discover his son's fraudulent manipulations until about August 11, 1939, when he immediately advised the Investment Corporation by letter. The relationship of Elroy Gulbro to the various business enterprises of his father is the basis of any determination of liability of the McVille State Bank. All of the checks bear an indorsement by the son similar to one set out above. Sometimes his name is followed by "mgr." Both the father and son testified as witnesses for the plaintiff. According to the father, he knew nothing of the transactions in question and, of course, never authorized his son to make the indorsements that appear on the checks. On direct examination he stated that no one inquired about the son's authority to cash these checks. A. L. Gulbro's bookkeeper corroborated most of his testimony. The father testified at considerable length concerning the connection of Elroy with his business. Elroy started working when he was quite small and in later years became active in assisting his father in operating the business. The son made collections and sales. He was an active, intelligent boy and as he became more experienced he was intrusted with more details and authority. The bookkeeper had general charge of all money coming in, the writing of

checks and generally making the disbursements necessary in the course of business. In some instances, Elroy Gulbro was permitted to indorse checks with the name of the Gulbro Implement & Hardware Company by himself and deposit these checks. For a short time he was permitted to draw checks on the bank account in connection with the automobile business.

A. L. Gulbro operated a currency exchange during 1934, 1935 and 1936. For about a year, Elroy was manager of this exchange. At other times, the bookkeeper acted as manager. The son usually signed and indorsed checks "Pekin Exchange—By: E. O. Gulbro." During the son's management of the exchange he obtained currency a number of times from the McVille State Bank. Occasionally he obtained this currency by using Gulbro Implement & Hardware Company or Gulbro Motor Company checks. The father was aware that the son indorsed and cashed various small checks using one or the other of the father's trade names. When asked whether the cashier of the McVille State Bank had ever telephoned or talked to him about Elroy's authority in relation to his getting currency from that bank the father answered, "Well, I do not recall it. I may have done it but I do not remember it." The father also testified that there was a time several years ago when Elroy was authorized to sign his name to checks issued on the bank at Tolna. About two and one-half years ago, he notified that bank to honor only checks signed by the bookkeeper or the father, A. L. Gulbro. Although the father knew that the son had been cashing checks made out in the trade name of the father, he never notified the McVille State Bank to stop that practice or to limit the amount of the checks cashed. He insisted that these amounts were usually small and the checks were so cashed only occasionally.

The cashier of the McVille State Bank had been cashing checks drawn by the Gulbro Implement & Hardware Company or payable to that name which Elroy Gulbro either signed or indorsed in the name of the Gulbro Implement & Hardware Company since 1936. He stated positively that he telephoned A. L. Gulbro in 1936 with reference to Elroy's authority to cash the first check and the father said it was all right. Thereafter the cashier raised no further question and continued to cash checks for the son from time to time. None of these checks or

the indorsements thereon were ever questioned until the present controversy arose. The practice continued from 1936 until the fall of 1939. During the period that the Pekin Exchange was being conducted, Elroy Gulbro would obtain currency from the McVille State Bank at frequent but irregular intervals—sometimes a week and other times a month apart. Some of the checks were payable to the Gulbro Implement & Hardware Company and were indorsed in the same manner as those involved in this case. No question was ever raised concerning those indorsements.

The trial court found that A. L. Gulbro by a course of conduct continuing over a period of years held out his son as being authorized to indorse his name and the name of the Gulbro Implement & Hardware Company on checks and also to issue checks in the name of the father or the company. The court further found that due to this conduct the McVille Bank was justified in believing and in acting upon the belief that Elroy Gulbro had authority to indorse and cash checks for his father in the manner in which the indorsements were made on the checks in controversy and that the conduct of A. L. Gulbro created an ostensible agency.

The rights of the plaintiff are based upon assignments to it from the two drawee banks and the Investment Corporation. In determining these rights as against the McVille State Bank we turn directly to the question of the authority of Elroy Gulbro to indorse and cash the checks issued by the Investment Corporation payable to the Gulbro Implement and Hardware Company. The whole transaction by virtue of which Elroy Gulbro came into possession of each check was fraudulent from its inception. He, therefore, had no authority to receive, indorse or cash any of the checks. However, if the father so conducted himself and knowingly permitted his son to act in dealing with others as to induce the officers and agents of the McVille State Bank to believe that Elroy had authority to make indorsements and cash checks in the manner in which he did the bank is not at fault.

The plaintiff quotes extensively from Embden State Bank v. Schulze, 49 ND 777, 193 NW 481. That case involves the authority of an employee to indorse a promissory note and transfer title thereby. The authority of the employee to make the indorsement as agent of the payee was challenged. It is stated that the mere possession of a nego-

tiable instrument by the agent of the payee gives rise to no presumption of authority in the agent to indorse the paper. It is further stated that power to indorse and negotiate commercial paper is not implied from express authority to transact other business for the principal unless such power is necessary to the execution of that authority. The principles thus laid down are generally recognized. They deal with the actual authority of the agent either express or implied. The power of an agent to bind the principal is not lightly to be inferred. Mechem, Agency, 2d ed. § 969. With respect to the ten checks in question in this lawsuit it is clear from the very nature of the transactions that Elroy Gulbro had neither express nor implied authority to indorse the checks in question in any manner but it does not necessarily follow that the McVille State Bank is liable for cashing the checks. An indorsement of a negotiable instrument by an agent executed pursuant to neither express nor implied authority may still be of such a nature and surrounded by such circumstances that the principal may be estopped from denying it. Mechem, Agency, 2d ed. § 970.

"If the principal holds the agent out as having such power or permits him to act as if he possessed it under circumstances which induce those dealing with the agent reasonably to rely on its existence, an apparent authority arises under which persons accepting commercial paper from the agent will be protected." 2 CJS Agency, § 112, p. 1300.

In Meyer v. National F. Ins. Co. 67 ND 77, 269 NW 845, we said, "Where a third party believes in the existence of such authority, and the belief rests upon some act of the principal sought to be bound, and there has been such conduct on the part of the principal reasonably resulting in this belief, the principal is estopped to deny this ostensible authority."

Section 6324, ND Comp. Laws 1913, thus describes ostensible agency: "An agency is ostensible when the principal intentionally or by want of ordinary care causes a third person to believe another to be his agent, who is not really employed by him."

Section 6336, ND Comp. Laws 1913, thus defines the authority of an agent: "An agent has such authority as the principal actually or ostensibly confers upon him."

Ostensible authority is then defined by § 6338 as follows: "Ostensi-

ble authority is such as the principal intentionally or by want of ordinary care causes or allows a third person to believe the agent to possess."

Under § 8 of the American Law Institute, Restatement of the Law of Agency, Vol. 1, we find the following Comment: "a. An apparent agent is a person who, whether or not authorized, reasonably appears to third persons, because of the manifestations of another, to be authorized to act as agent for such other. An apparent principal is the person for whom an apparent agent purports to act. The apparent agent may have authority which is coextensive with his apparent authority; he may be authorized to act in other ways but not in the way as to which he has apparent authority; or he may not be authorized to act in any respect for the purported principal. If the authority and the apparent authority are coextensive, the liability of the principal resulting from conduct of the agent may be based upon either authority or apparent authority."

In the case before us, there being no actual or implied authority on the part of Elroy Gulbro to cash the checks that he fraudulently procured from the Investment Corporation, The McVille State Bank is liable unless the conduct of A. L. Gulbro was such that under the circumstances Elroy may be said to have had apparent or ostensible authority to indorse the checks in the manner described by the record. We have previously set out in some detail the testimony from which the trial court found that ostensible authority existed and that the bank was justified in relying thereon when it cashed the checks.

It is asserted that the cashier of the bank should have made inquiry before cashing checks to the extent of those involved in this case and that the previous legitimate and authorized transactions in which Elroy Gulbro had been engaged with the bank were not of sufficient importance, magnitude or frequency to justify the bank in cashing the fraudulent checks. We are unable to agree with this contention. Elroy Gulbro had been actively connected with his father's business for a number of years. While the transactions that had actually come to the knowledge of the bank had not been large they had apparently been handled over a period of several years without question being raised as to Elroy's authority. The fraudulent checks were cashed at considerable intervals beginning in September, 1938, and continuing until

July, 1939. The amounts ranged from $198 to $476. While substantial, they are not so large that the court can say that they should have aroused such suspicions on the part of the cashier of the bank as to require him to make special inquiry.

The American Law Institute, Restatement of the Law of Agency, Vol. 1, § 27, lays down this rule for the creation of apparent authority: "Except for the execution of instruments under seal or for the conduct of transactions required by statute to be authorized in a particular way, apparent authority to do an act may be created by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes a third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him."

Even though as between the Gulbros the checks were written without authority it does not follow that as to the bank that cashed them that the checks were forgeries. Oquendo v. Federal Reserve Bank. (CCA 2d) 98 F(2d) 708.

Elroy Gulbro had for several years acted as the authorized agent of his father in connection with the business of the Gulbro Implement & Hardware Company, the Gulbro Motor Company and the Pekin Exchange. If not the actual agent of his father for the purpose of cashing checks drawn in favor of the business thus conducted, he was at least an agent with ostensible authority to do so.

As between A. L. Gulbro and the bank of McVille, the loss resulting from the fraud of Elroy Gulbro must be suffered by the father and not by the bank that dealt with the agent who appeared to be acting within the apparent scope of his ostensible agency. Bernard v. Madsen, 52 ND 822, 204 NW. 196; Rice v. People's Sav. Bank, 140 Wash 20, 247 P 1009; First Nat. Bank v. Lovell H. Turnbull Co. 257 Mich 295, 241 NW 244; Pearl-Stone-Ash Grocery Co. v. Rembert Nat. Bank (Tex Civ App) 135 SW(2d) 559; W. C. Biggers & Co. v. First Nat. Bank (Tex Civ App) 29 SW(2d) 841; Valiquette v. Clark Bros. Coal Min. Co. 83 Vt 538, 77 A 869, 34 LRA(NS) 440, 138 Am St Rep 1104; Sinclair Ref. Co. v. First Nat. Bank, 45 Ga App 769, 165 SE. 860; Henry Cowell Lime & Cement Co. v. Santa Cruz County Nat.

Bank, 82 Cal App 519, 255 P 881; Oquendo v. Federal Reserve Bank (CCA 2d) 98 F(2d) 708, supra.

It is further argued by the appellant that though it be assumed that Elroy Gulbro had ostensible authority to indorse and cash the checks, the defendant bank and the intervener bank are nevertheless liable to the plaintiff as assignee of the drawee banks and the Investment Corporation because of the provisions of § 6908, ND Comp. Laws 1913 which are as follows: "Where a signature is forged or made without authority of the person whose signature it purports to be, it is wholly inoperative, and no right to retain the instrument, or to give a discharge therefor, or to enforce payment thereof against any party thereto, can be acquired through or under such signature, unless the party, against whom it is sought to enforce such right, is precluded from setting up the forgery or want of authority."

It is argued that the ostensible agency may preclude A. L. Gulbro from setting up the forgery or want of authority but this preclusion does not apply to the Investment Corporation, the drawee banks or their assignees.

It is further argued that under §§ 6950 and 6951, ND Comp. Laws 1913, the McVille Bank by placing its indorsement on the checks guaranteed all prior indorsements and is responsible to the maker of the check and the drawee banks regardless of the ostensible authority of Elroy Gulbro.

It is generally held that a bank upon which a check is drawn which has been cashed by another bank upon a forged indorsement of the payee's name, may recover from the collecting bank the money paid on the check in the due course of business. First Nat. Bank v. Federal Reserve Bank, 88 Mont 589, 294 P 1105; American Exp. Co. v. People's Sav. Bank, 192 Iowa 366, 181 NW 701.

This court has taken the view that the drawee who has paid a forged check without detecting the forgery may upon discovery thereof recover the money paid from the party who received it even though the latter is a good faith holder provided he has not been misled or prejudiced by the drawee's failure to detect the forgery. First Nat. Bank v. Bank of Wyndmere, 15 ND 299, 108 NW 546, 10 LRA(NS) 49, 125 Am St Rep 588.

In the case before us, the McVille State Bank cashed the checks in question upon the ostensible authority of Elroy Gulbro to indorse them. It is clear that as between the father, A. L. Gulbro, and the bank that cashed these checks the payee cannot be heard to say that the indorsements were either forgeries or unauthorized.

Although § 6908, ND Comp. Laws 1913, seems to put unauthorized signatures in the same category as forged signatures (see Knoxville Water Co. v. East Tennessee Nat. Bank, 123 Tenn 364, 131 S. W. 447), it does not necessarily follow that the rule applied in First Nat. Bank v. Bank of Wyndmere, supra, should govern in this case.

The checks involved in this case are not forgeries. They are negotiable instruments that, when issued by the Investment Corporation, were at least in the hands of innocent parties both valid and valuable. They are property subject to transfer in accordance with the provisions of the Negotiable Instruments Law.

A forged indorsement does not pass title even though the forgery be on an otherwise valid instrument. United States v. Guaranty Trust Co. 293 US 340, 79 L ed 415, 55 S Ct 221, 95 ALR 651. Neither does an indorsement made without authority either actual, implied or ostensible pass title. In this case Elroy Gulbro transferred the checks by indorsement. His authority although not actual was ostensible. It was sufficient to pass the title to the checks to the McVille State Bank. Upon this indorsement the bank took the checks, cashed them and in turn indorsed them. The drawee banks received the checks and honored them in the usual course of business.

The McVille State Bank became a holder in due course by virtue of the indorsements made by the payee's agent under ostensible authority. As such holder it had a right to receive payment from the drawee banks. ND Comp. Laws 1913, § 6942; Dispatch Printing Co. v. National Bank, 109 Minn 440, 124 NW 236, 50 LRA(NS) 74. The drawee banks honored the checks in the course of business but this does not make them holders in due course. They are not entitled to assert the warranties of a general indorser as against the McVille State Bank. The appellant urges that § 6951, ND Comp. Laws 1913, applies and entitles the plaintiff as assignee of the drawee banks to recover on the strength of the indorsement of the McVille State Bank. The war-

ranties mentioned in this section are available only to holders in due course. The drawee banks are not such holders. National Bank v. Seattle Nat. Bank, 109 Wash 312, 187 P 342; Wells Fargo Bank & Union Trust Co. v. Bank of Italy, 214 Cal 156, 4 P(2d) 781; Louisa Nat. Bank v. Kentucky Nat. Bank, 239 Ky 302, 39 SW(2d) 497. The drawee banks had no right of recovery against either the defendant or the intervener and so conveyed nothing to the plaintiff by their assignments.

The plaintiff also holds an assignment of the rights of the drawer of the checks, the Investment Corporation, but again the assignor had nothing to assign as against the defendant and the intervener. None of the parties involved in this action had knowledge of the fraudulent practices of Elroy Gulbro. The Investment Corporation executed and placed in circulation its negotiable checks. It was induced to issue these instruments because of fraud. That fact standing as it does in this record without circumstances to indicate to third persons the existence of such fraud cannot be made the basis of an action by the Investment Corporation against innocent parties who became the holders of the checks in due course. Neither the negotiable instruments law nor equity affords the drawer of the checks or its assignee any recourse against either the defendant or the intervener. All parties to this suit are innocent but it was the Investment Corporation that issued the checks in what seemed to be bona fide transactions of one of its customers. It may have been imposed upon and defrauded but it cannot pass its losses on to other innocent parties. Missouri P. R. Co. v. M. M. Cohn Co. 164 Ark 335, 261 SW 895.

The record discloses no liability on the part of either the defendant or intervener to any of the plaintiff's assignors. The trial court properly directed the dismissal of the action. Affirmed.

BURR, Ch. J., and CHRISTIANSON, NUESSLE, and BURKE, JJ., concur.